## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | )      **8:06CR42** |
| Plaintiff, | ) |
| | ) |
| vs. | )      **REPORT AND** |
| | ) |
| **ADRIAN L. HUDSON,** | )      **RECOMMENDATION** |
| | ) |
| Defendant. | ) |

This matter is before the court on the motion to suppress filed by defendant Adrian L. Hudson (Hudson) (Filing No. 11). Hudson is charged in the Indictment with the possession with intent to distribute 5 grams or more of "crack" cocaine (Count I) in violation of 21 U.S.C. § 841(a)(1) and with the distribution of "crack" cocaine (Count II) in violation of 21 U.S.C. § 841(a)(1). Hudson seeks to suppress evidence obtained from Hudson during a strip search at the Omaha Police Department (OPD) on January 10, 2006. An evidentiary hearing was held on Hudson's motion on April 24, 2006. During the hearing, the court heard the testimony of OPD Officers James Paul (Officer Paul), Eugene Watson (Officer Watson), and Dan Williams (Officer Williams), OPD Sergeant Dave Bianchi (Sergeant Bianchi), and OPD Detention Officer Karla Krzycki (Officer Krzycki). The court also received into evidence the following exhibits: a DVD of the search (Exhibit 1); a photo of the defendant (Exhibit 2); a copy of the OPD Search of Persons Policy (Exhibit 3); a copy of an OPD report relating to a confidential informant (Exhibit 4 (Sealed) - Exhibit 4A, a redacted copy of Exhibit 4, was provided to counsel); an OPD report of 1/13/06 (Exhibit 102); an OPD report of 1/14/06 (Exhibit 103); an OPD Interoffice Communication (Exhibit 104); and an index of events depicted on the DVD in Exhibit 1 (Exhibit 110). A transcript of the hearing (TR.) was filed on May 6, 2006 (Filing No. 22).

### FINDINGS OF FACT

On January 10, 2006, Officer Paul, an OPD investigator assigned to the North Gang Squad, was conducting a controlled purchase of "crack" cocaine through a cooperating individual (CI) (TR. 11-13). Officer Paul had worked with the CI some seven to ten times

in the past, and the CI's past information had been corroborated as true (TR. 12; 18). Officer Paul was monitoring a voice transmitter worn by the CI as he met with Hudson (known to the CI as A.D.) near 56th and Ames Streets in Omaha (TR. 13). Hudson was alone driving a Chevy Astro gray van (TR. 13). The CI, driving his vehicle, stopped and entered Hudson's van (TR. 14). Shortly thereafter, the CI got out of Hudson's van, entered his own vehicle, informed Officer Paul through the transmitter that the purchase had been made, and drove off to a predetermined location to meet Officer Paul (TR. 15). Officer Paul followed the Chevy Astro van and advised other officers to stop the van (TR. 15). Officer Paul kept a visual observation of the van until other OPD officers began to follow the van (TR. 15). Officer Paul then drove off to meet with the CI at the predetermined location (TR. 15). When Officer Paul met with the CI, the CI gave Officer Paul a package of "crack" cocaine and informed Officer Paul that A.D. still had a large package of "crack" cocaine on his person (TR. 16). The CI described the package as the size of a golf ball using his hands (TR. 16). The CI told Officer Paul that A.D. still had the package in the van when the CI got out of the van (TR. 17). Officer Paul testified that, in his experience, it was common for street-level dealers to carry packages of "crack" cocaine in their buttocks or mouth (TR. 17). However, the package as described by the CI would be unlikely to be concealed in the mouth but, more likely, in the buttocks area (TR. 17). Officer Paul relayed this information to his sergeant, Sergeant Bianchi, who assumed control of the investigation that evening (TR. 18).

     OPD Officers Watson and Edie Anderson were assigned outside perimeter duties for the above described controlled purchase on January 10, 2006, and were in a semi-marked patrol unit (TR. 39). Officers Watson and Anderson monitored the conversations of the operation until the drug buy took place (TR. 40). After being notified that the drug buy took place, Officers Watson and Anderson were notified by Sergeant Bianchi to perform a traffic stop on Hudson's Astro van (TR. 41). Officers Watson and Anderson got behind the van as it was going westbound on Ames Avenue and observed a defective muffler on the van as the muffler was being dragged on the pavement causing sparks (TR. 41). The officers also observed the van turn through a red stop light as the van turned onto 60th Street (TR. 41). Officers Watson and Anderson engaged their emergency lights to

stop the van (TR. 41). Hudson took a while to pull over as he drove about an extra block into a gas station and then pulled over (TR. 43). Officer Watson testified Hudson did not appear to move from the driver's seat of the van while the officers were following Hudson (TR. 43). Officer Anderson approached the driver's side of the stopped van and Officer Watson approached the passenger side of the van (TR. 41). Hudson was the only occupant of the van (TR. 42). In addition to the traffic violations observed, Hudson also had an outstanding warrant for his arrest and his driver's license was suspended (TR. 42). Hudson got out of the van and was placed under arrest (TR. 43). Officer Watson conducted a pat down of Hudson's outer clothing and did not find any contraband (TR. 43-44). Officer Watson testified he did not "blade" his hand up and down between Hudson's buttock area when conducting the pat down (TR. 44). Officer Watson then searched the van and found the buy money in a center console within arm's reach of the driver's seat (TR. 45). After having searched the entire inside of the van, Officer Watson found no controlled substances (TR. 45-46). Officer Anderson was asked to double search the van, and she found nothing (TR. 46). Hudson was transported to Central Police Headquarters by Officers Watson and Anderson in their police car (TR. 47). Following Hudson's removal from the car, the back seat area was searched and nothing was found (TR. 47). Hudson was taken into the booking area (TR. 48).

After finding no controlled substances at the scene of the arrest, such information was relayed to Sergeant Bianchi (TR. 116-117). Sergeant Bianchi directed officers to conduct a strip search of Hudson to be performed at Central when Hudson was booked (TR. 119). Sergeant Bianchi testified he had the authority to order the strip search and did so because of the information from the cooperating witness at the buy scene that Hudson had more "crack" cocaine, finding of the buy money in the van, finding no controlled substances after searching the van, finding no controlled substances during the external pat down of Hudson at the scene (TR. 119). From Sergeant Bianchi's experience, he believed that drugs were hidden between Hudson's buttocks or under Hudson's scrotum (TR. 119).

Hudson was taken into a detention room in the jail area by Officer Watson and Officer Dan Williams (TR. 49). The dimensions of the room was approximately 8 feet by

3

8 feet with a table in the center and chairs on each side of the table (TR. 49). There was a camera set up in the room, but the lens was covered before Hudson was asked to strip (TR. 49). There was no other recording device in the room (TR. 49). The door to the room was closed and the window in the door was covered (TR. 49). There was a camera that filmed the door of the room and the hallway (TR. 50; Exhibit 1). When privacy was assured, Officer Watson explained what was going to happen to Hudson (TR. 51). Officer Watson told Hudson that the officers received information that Hudson may have narcotics or controlled substances on his person and that Hudson was going to be strip searched to insure he did not have anything concealed on him (TR. 51). Hudson was asked for his assistance in turning any such items over to the officers (TR. 51). Officer Watson told Hudson that Officer Watson was going to tell Hudson to remove an article of clothing from Hudson's person and hand it to Officer Watson (TR. 51). Hudson was told that the item of clothing would be inspected before the next item of clothing would be removed (TR. 51-52). Hudson was told to stand with his hands open while each item of clothing was being inspected (TR. 52). Hudson was told not to make any unnecessary movements as such movement would be interpreted as being an attempt to destroy evidence and the officers would have to react accordingly by using whatever force was necessary to prevent him from destroying evidence (TR. 52). Hudson said he would cooperate with the officers (TR. 52).

Officer Watson asked Hudson to remove Hudson's cap (TR. 52). Hudson replied "Fuck this. You're going to have to handcuff me" (TR. 52). Officer Watson told Hudson to turn around and place his hands on the wall (TR. 53). As Officer Watson was in the process of moving toward Hudson to handcuff Hudson, Hudson pushed both Officers Watson and Williams away (TR. 53). As the officers moved in to control Hudson, Hudson began kicking, swinging, and throwing elbows (TR. 53). Officer Watson attempted to gain control of Hudson by punching Hudson in the face and taking Hudson to the floor (TR. 53). Once on the floor, Hudson continued to fight the officers including biting Officer Williams on the arm (TR. 53-54). The fight drew the attention of the detention technicians who were in the hallway outside the detention room (TR. 54). As soon as two male technicians were able to push open the door, they entered the room to assist in controlling Hudson (TR. 54).

4

Hudson was finally handcuffed, and Hudson began calling for a sergeant (TR. 54-55). Sergeant Bianchi arrived and informed Hudson he was the sergeant and that the officers were going to conduct a strip search of Hudson (TR. 55). Hudson was screaming and yelling and told Sergeant Bianchi that they were going to have to cut his clothes off (TR. 55; 121-122). Hudson was on his stomach with his feet inwards and locked so as to prevent the removal of any clothing (TR. 56). Sergeant Bianchi told Hudson that Hudson would be strip searched and that Hudson should stand up and cooperate before they had to forcibly remove his clothing (TR. 121). Hudson replied that he was not going to be strip searched (TR. 122). Sergeant Bianchi then told Hudson he (Sergeant Bianchi) was going to forcibly remove Hudson's clothing (TR. 122). Hudson screamed at the officers to "go ahead and try" (TR. 122). While Officer Watson held Hudson's legs down, Sergeant Bianchi grabbed Hudson's pants and pulled them down (TR. 122). Then Sergeant Bianchi pulled Hudson's underwear down (TR. 123). Hudson was holding his legs together and kicking (TR. 123). Sergeant Bianchi instructed Officers Watson and Williams to pull Hudson's legs apart, whereupon Sergeant Bianchi could see a ping-pong sized ball of "crack" cocaine clenched between the cheeks of Hudson's buttocks (TR. 124). This was removed and Sergeant Bianchi observed a paper towel underneath the ball of "crack" cocaine, which he removed (TR. 125). Upon removal, Sergeant Bianchi observed Hudson's anus (TR. 125). Following the search of Hudson, Hudson was transported, in custody, to Creighton Medical Center for treatment for his bruised eye (TR. 58). Thereafter, Hudson was returned to jail (TR. 60).

     It is the OPD policy and that of the OPD Detention Facility that strip searches not be conducted in the presence of a person of the opposite sex of the subject (TR. 129; 108; Exhibit 3). During the struggle to subdue Hudson and during the strip search, the video recording depicts Officer Edie Anderson, a female OPD officer, present during much of the procedure (Exhibit 1). Officer Anderson was not in the room for the initiation of the strip search but entered the room after the melee started. The video also depicts several female detention officers looking into the room during the commotion. From the testimony presented in this matter, the court finds there was no penetration of any of Hudson's body cavities.

## LEGAL ANALYSIS

Hudson argues a warrant should have been obtained to conduct a strip search of Hudson. Hudson further argues the presence of female officers during the strip search violated established OPD policies and humiliated Hudson by being exposed in his nakedness to officers of the opposite sex thereby rendering any strip search of Hudson as unreasonable.

In ***Bell v. Wolfish***, 441 U.S. 520 (1979), the Supreme Court found that visual body cavity inspections of pretrial detainees could be conducted on less than probable cause for the purpose of security concerns of the detention facility. ***Id.*** at 560. "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record. . . ." ***Id.*** at 559.

Apart from security concerns, the OPD officers believed Hudson was concealing evidence of his drug transactions. The CI reported Hudson had additional quantities of "crack" cocaine in his possession after the CI purchased the agreed-upon quantity of drugs. Hudson was followed and kept in sight at all times after the sale until Hudson was stopped by the OPD officers. Nothing was found on Hudson in a cursory pat down of his person or in the vehicle he was driving. Sergeant Bianchi testified as to his prior experience with male drug dealers and the secreting of drugs between their buttocks or under their scrotum. Officers may conduct a full search of a person incident to a suspect's arrest. ***United States v. Robinson***, 414 U.S. 218, 234 (1973). This search can be conducted at the scene of the arrest or later in the booking area to avoid such a search on the street at the scene of the arrest. ***Illinois v. Lafayette***, 462 U.S. 640, 645 (1983).

The search in this case was not a full body cavity search where the body cavities were penetrated to determine if there was contraband hidden therein. The search in this case was a visual inspection which readily exposed contraband when Hudson's body cavity areas were exposed. While the OPD officers had reason to believe Hudson was secreting contraband on his person, the steps taken to insure Hudson's privacy in conducting the search were reasonable. The search was to take place in a closed room by two male

officers.  The window on the door was covered as was the camera lens in the room. Further, Officer Watson explained in detail the procedure on how the search was going to be conducted and sought Hudson's cooperation.  Only after Hudson assaulted the officers and struggled with them, did additional police personnel enter the room to subdue Hudson. During that struggle and ensuing forceful removal of some of Hudson's clothing, a female OPD officer, Officer Anderson, entered the room to assist the officers in the struggle.  Her presence was not to embarrass Hudson or invade Hudson's privacy, but to assist fellow officers in trouble.   Further, while there may have been female detention officers looking into the room, such glances were for the purpose of seeing what trouble was taking place in the room by Hudson's struggle with the officers.  The court does not find the presence of such female officers rises to a constitutional violation of Hudson's Fourth Amendment rights warranting the suppression of evidence found during the strip search of Hudson.

The Fourth Amendment prohibits only unreasonable searches, **Carroll v. United States**, 267 U.S. 132, 147(1925).  As stated by the court in **Bell v. Wolfish**:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559.  The strip search of Hudson was conducted in a reasonable manner considering the totality of the circumstances of this case.  Any complications of a smooth and routine strip search arose solely from Hudson's assault on the officers and Hudson's struggle with the officers.  Hudson's motion to suppress should be denied.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Hudson's motion to suppress (Filing No. 11) be denied.

**ADMONITION**

      Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

      DATED this 14th day of June, 2006.

                                                  BY THE COURT:

                                                  s/Thomas D. Thalken
                                                  United States Magistrate Judge